# Exhibit B



**U.S. Department of Justice**
**Federal Bureau of Prisons**

_Central Office_
_320 First St., NW_
_Washington, DC  20534_

June 29, 2021

Sephanie Krent
Knights First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115                    Request Number: 2021-05206

Dear Stephanie Krent:

The Federal Bureau of Prisons (BOP) received the above-referenced Freedom of Information Act (FOIA) request wherein you seek expedited processing. A copy of your request is attached.

The Department of Justice requires all requests for records be processed on a first-in, first-out basis. The four exceptions to this requirement are: "(i) Circumstances in which the lack of expedited processing could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; (ii) An urgency to inform the public about an actual or alleged Federal Government activity, if made by a person who is primarily engaged in disseminating information; (iii) The loss of substantial due process rights; or (iv) A matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence." 28 C.F.R. § 16.5(e).

Your request meets the requirement to be processed on an expedited basis and will be expedited to the best of our ability. This request will be placed on the processing track ahead of other requests and processed as soon as practicable. Processing this request may take up to six months.

**Please be advised that due to necessary operational changes as a result of the national emergency concerning the novel coronavirus disease (COVID-19) outbreak, there may be some delay in the processing of your request.**

If you have any questions, please contact the undersigned or BOP's FOIA Public Liaison, Mr. Eugene Baime, at: 202-616-7750 (phone); 320 First Street NW, Suite 936, Washington, DC 20534; or ogc_efoia@bop.gov. You can also check the status of your request at http://www.bop.gov/PublicInfo/execute/foia.

Sincerely,

_P. Willcott_

P. Willcott, for
Eugene E. Baime, Supervisory Attorney

**OGC Electronic Freedom of Information - FOIA Request - Knight First Amendment Institute**

| | |
|---|---|
| **From:** | Stephanie C Krent <stephanie.krent@knightcolumbia.org> |
| **To:** | "OGC_EFOIA@BOP.GOV" <OGC_EFOIA@BOP.GOV> |
| **Date:** | 6/25/2021 3:24 PM |
| **Subject:** | FOIA Request - Knight First Amendment Institute |
| **CC:** | Alexander A Abdo <alex.abdo@knightcolumbia.org>, Xiangnong Wang <george.... |
| **Attachments:** | Knight Institute FOIA request 06.25.21.pdf |

To whom it may concern,

Please find attached a Freedom of Information Act request. We have requested expedited processing.

Thank you,
Stephanie Krent

Stephanie Krent
Staff Attorney
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302 | New York, NY 10115
stephanie.krent@knightcolumbia.org | (646) 745-8500



**KNIGHT
FIRST AMENDMENT
INSTITUTE** at
**COLUMBIA UNIVERSITY**

475 Riverside Drive, Suite 302
New York, NY 10115

(646) 745-8500
info@knightcolumbia.org

June 25, 2021

FOIA/PA Section
Office of General Counsel, Room 924
Federal Bureau of Prisons
320 First Street, N.W.
Washington, DC 20534

OGC_EFOIA@BOP.GOV

**Re:    Freedom of Information Act Request
         Expedited Processing Requested**

To whom it may concern,

The Knight First Amendment Institute at Columbia University ("Knight Institute" or "Institute")[1] submits this request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for records concerning the digitization and retention of mail sent to individuals incarcerated in jails and prisons.

## I.  Background

For the over 200,000 individuals currently incarcerated in federal correctional facilities,[2] the ability to send and receive mail is a lifeline, connecting them to loved ones, community members, educators, religious leaders, and social services. During the COVID-19 pandemic, in-person visitation has been restricted or

---

[1] The Knight First Amendment Institute is a New York not-for-profit corporation based at Columbia University that works to preserve and expand the freedoms of speech and the press through strategic litigation, research, and public education.

[2] *See* Peter Wagner & Wendy Sawyer, *How Many People Are Locked Up In the United States?*, Prison Policy Initiative (2020), https://perma.cc/R37J-XR9N.

eliminated entirely,[3] making letter-writing one of the few remaining forms of communication available to those incarcerated.[4] But in March 2020, the Bureau of Prisons (the "Bureau") launched a new pilot program that denies incarcerated people the original mail sent to them and subjects both the senders and recipients of those letters to heightened surveillance.

Under the pilot program, which appears to be ongoing as of June 2021,[5] a private telecommunications contractor called Smart Communications opens and scans all non-privileged mail sent to at least two federal correctional facilities.[6] The Bureau of Prisons has not publicly disclosed the details of this program, which Smart Communications calls its MailGuard system. A proposal submitted by Smart Communications to the Virginia Department of Corrections, however, explains that incoming mail is routed to a site in Florida, where Smart Communications processes, scans, and uploads images of the mail into a proprietary database accessible to employees at the correctional facilities.[7] Employees can review and either approve or reject the incoming mail in the database. If approved, a photocopy of the mail is printed and delivered to the recipient. Originals, including handwritten letters, drawings, and photographs, are never shared

[3] The Bureau of Prisons halted all in-person visitation in March 2020. *See* Michael Balsamo, *Visits Halted in Federal Prisons, Immigration Centers Over Virus*, PBS NewsHour (Mar. 13, 2020, 8:16 PM), https://perma.cc/5WJ9-AZMZ. In October 2020, the Bureau reinstated visitation at federal correctional facilities, although facilities have provided visitation hours at reduced rates. *See* Michael Balsamo & Michael R. Sisak, *Visitation to Begin Again at Federal Prisons in October*, Associated Press (Aug. 31, 2020), https://apnews.com/article/virus-outbreak-politics-170e3fccd809b709a7e24c65bc4b0492 (last visited June 24, 2021); Memorandum for Inmate Population from E. Bradley, Warden, USP Social Visiting (Mar. 19, 2021), https://perma.cc/3EUD-PTRB (outlining reduced visitation schedule at USP Canaan); Visit Rotation Schedule 2021, Fed. Bureau of Prisons, https://perma.cc/QGS4-LLRT (outlining reduced visitation schedule at FCI Beckley).

[4] *See* Alia Nahra & Leily Arzy, *Protecting the Fundamental Right to Mail in Prison*, Brennan Ctr. (Aug. 21, 2020), https://perma.cc/D8JF-M2UG.

[5] *FCI Beckley*, Fed. Bureau of Prisons, https://perma.cc/5ZJ9-D7BN (instructing senders of general correspondence to mail letters to Smart Communications under heading "How to Send Things Here"); *USP Canaan*, Fed. Bureau of Prisons, https://perma.cc/RN55-9NQA (same).

[6] Marica Brown & David Dayden, *Physical Mail Could Be Eliminated at Federal Prisons*, The American Prospect (Feb. 24, 2021), https://perma.cc/8ADN-G7SG.

[7] *See* Smart Communications, *Virginia Department of Corrections Mail-Guard Proposal* 1, https://perma.cc/6JYQ-M7YN ("MailGuard Proposal").

with the incarcerated individual.[8] Under the MailGuard system, employees can also select certain incarcerated individuals for heightened surveillance, including by setting text or email alerts that automatically send staff investigators a copy of every letter sent to that individual.[9]

Reporting suggests that Smart Communications retains electronic copies of mail for years, and possibly indefinitely, creating a searchable database of all correspondence that can be used to target and investigate both senders and recipients. The Bureau has stated that, under its pilot program, original correspondence is retained for at least thirty days and destroyed at some point thereafter.[10] Electronic copies, however, appear to be retained for at least seven years, and perhaps indefinitely. Smart Communications' proposal to the Virginia Department of Corrections states that it retains the electronic copies of mail for "a minimum of 7 years."[11] In late 2018, the CEO of Smart Communications specified that electronic copies were retained for at least seven years after the recipient had been released from incarceration, if ever.[12] "[In] almost 10 years of business," he told a reporter, "Smart Communications has never lost or deleted any records or any data from our database. There are hundreds of millions of data records stored for investigators at anytime."[13]

Beyond retaining copies of these letters, Smart Communications uses a tool called the MailGuard Smart Tracker to collect and retain additional data about the senders of mail. Smart Communications advertises the Smart Tracker as providing correctional officers with "significant new intelligence about the public sender of the postal mail, giving postal mail a digital

---

[8] *Id.* at 1–2.

[9] *Id.*

[10] *See* Alaina Demopoulos, *Inmates Love Their Handwritten Mail. This Federal Prison Gives Them Photocopies.*, Daily Beast (Aug. 23, 2020, 12:27 PM), https://perma.cc/6CX4-966D.

[11] MailGuard Proposal at 3.

[12] Samantha Michaels, *Pennsylvania Replaced Prison Mail with Photocopies. Inmates and Their Families Are Heartbroken.*, Mother Jones (Dec. 13, 2018), https://www.motherjones.com/crime-justice/2018/12/pennsylvania-replaced-prison-mail-with-photocopies-inmates-and-their-families-are-heartbroken/ (last visited June 24, 2021).

[13] *Id.*

fingerprint."[14] To members of the public, Smart Communications advertises the Smart Tracker as a tool allowing senders to follow the status of the mail sent into prisons and jails through the Mail-Guard system. But senders who attempt to track their mail in this way subject themselves to additional surveillance. In providing this service, Smart Communications reports that it collects senders' email addresses, physical addresses, IP addresses, phone numbers, and GPS locations.[15] The Smart Tracker maintains a profile on each sender that contains this data, as well as copies of every letter sent through Smart Communications for at least seven years and a list of all "connections"—that is, every incarcerated individual the sender has communicated with.[16]

Early experiences with Smart Communications' MailGuard system suggest that the system impairs the ability of incarcerated individuals and their loved ones to communicate freely and meaningfully. The pervasive surveillance enabled by Smart Communications has chilled the expression of members of the public who wish to send mail to those held in correctional facilities. In response to Pennsylvania's adoption of the MailGuard system in 2018, for example, the spouse of an incarcerated individual said that she will not "send any pictures to [her husband] that have faces of our children, our grandchildren," because she and her husband "want[] no family faces saved in that database whatsoever."[17] Another spouse has stopped sending her child's original artwork to her incarcerated husband.[18]

The system has made meaningful communication through correspondence more difficult, further isolating those who are incarcerated. After the adoption of mail digitization measures, incarcerated people have reported long delays in receiving mail and incorrect copying, including distorted photographs, illegible letters, and lost pages.[19] The loss of original mail weighs heavily on

---

[14] MailGuard Proposal at 3.

[15] *Id.*

[16] *Id.*

[17] Michaels, *supra* n.12.

[18] Samantha Melamed, *"I Feel Hopeless": Families Call New Pa. Prison Mail Policy Devastating*, Phila. Inquirer (Oct. 15, 2018), https://perma.cc/RB9J-4HW3.

[19] *Id.*; *see also* Michaels, *supra* n. 12; Mia Armstrong, *Is This What Prison Mail Looks Like Now?*, Slate (Dec. 5, 2018, 1:39 PM), https://perma.cc/T2ND-AYUQ.

those incarcerated. Gregory Marcinski, who has been incarcerated for almost 20 years, said that he could still smell the scent of his father's favorite cigarettes on the last letter he received before his father passed away in 2016. He treasures the ability to "see the ink he used on that paper," especially as he can no longer receive original letters from his partner or her children.[20]

The MailGuard system also threatens privileged and confidential mail. Although legal mail is not supposed to be routed to Smart Communications under the Bureau's pilot program, at least one incarcerated individual has complained that legal mail sent to him was scanned and copied as well.[21] The MailGuard system may also violate the confidentiality standards required for certain sensitive communications. Just Detention International, a human rights organization, has argued that the system is inconsistent with the national standards set under the Prison Rape Elimination Act requiring correctional facilities to "enable reasonable communication between inmates and [victim advocacy] organizations and agencies, in as confidential a manner as possible."[22]

Smart Communications markets its service as a method of improving safety and security in correctional facilities, but there is little evidence that programs like the MailGuard system improve security. Pennsylvania adopted the MailGuard system in 2018 in response to the risk that incoming letters soaked in synthetic cannabinoids could introduce contraband into prisons and jails and could sicken staff.[23] But the introduction of the MailGuard system did not lead to a decrease in the average drug test positivity rate.[24] Reporting suggests that in general, correctional officers— not letter-writers or even in-person visitors—are primarily responsible for the introduction of contraband to correctional facilities.[25]

---

[20] Demopoulos, *supra* n.10.

[21] *See id.*

[22] 28 C.F.R. § 115.53(a); *see also* Just Detention Int'l, *Help Us Protect Prison Mail!*, https://perma.cc/V3YC-Z45L.

[23] *See* Michaels, *supra* n.12.

[24] Brown & Dayden, *supra* n.6.

[25] *See* Jolie McCollough & Keri Blakinger, *Texas Prisons Stopped In-Person Visits and Limited Mail. Drugs Got in Anyway.*, Texas Trib. (Mar. 29, 2021, 6:00 AM), https://perma.cc/E2RU-WWUB (finding that the presence of drugs in Texas facilities increased after new visitation and mail restrictions,

Though the Biden administration has disclosed that it is considering extending and expanding the pilot program,[26] the Bureau has not provided key information to the public about the program and how it operates. The Bureau has not publicly updated its general correspondence policy to account for the introduction of the MailGuard system.[27] It has not disclosed any policies on the retention of data derived from correspondence that is stored in Smart Communications' database. It has not disclosed its policies on when or whether Bureau employees or other law enforcement personnel may access data on Smart Communications' database for general investigative purposes. It has not disclosed any data demonstrating whether the MailGuard system has reduced contraband in federal jails and prisons, or data demonstrating the extent to which contraband is being introduced through general correspondence. To help the public better understand the extent of the Bureau of Prisons' surveillance of correspondence, the Knight Institute files this FOIA request.

## II.  Records Requested

The Knight Institute seeks the following records:

1. The following records regarding mail digitization systems[28] at correctional facilities:

   a. All requests for proposals, responses to requests for proposals, contracts, and formal or informal agreements;

   b. Privacy impact assessments, audit reports, progress reports, and reports to oversight bodies;

---

suggesting that "the persistent contraband problem is driven mostly by staff"); *cf.* Jorge Renaud, *Who's Really Bringing Contraband into Jails? Our 2018 Survey Confirms It's Staff, Not Visitors*, Prison Policy Initiative (Dec. 6, 2018), https://perma.cc/VMC3-PRKD; Ben Conarck, *Women Describe "Degrading" Strip Searches at Baker Prison Visitation*, Fla. Times-Union (Mar. 24, 2018, 6:28 PM), https://perma.cc/N7G3-BTL5 ("Former corrections officials and prison researchers generally agree that visitors are less likely sources of contraband than officers and staff.").

   [26] *See* Brown & Dayden, *supra* n.6; Demopoulos, *supra* n.10.

   [27] *See* Fed. Bureau of Prisons, Program Statement on Correspondence (Apr. 5, 2011), https://perma.cc/76AM-LY8H.

   [28] By "mail digitization system," the Knight Institute means to include the MailGuard program, the Smart Tracker program, and any other mail digitization efforts or proposals.

    c.  Data retention policies;

    d.  Policies concerning the retention or destruction of physical mail; and

    e.  A list of all systems of records that store, on a temporary or permanent basis, data collected through or derived from mail digitization systems.

2.  All records concerning the retention of electronic copies of mail, or data derived from such mail, including but not limited to:

    a.  Records describing the Bureau's ability to search or use data collected through or derived from mail digitization systems, including the legal standard, if any, that is required before searching for or using that data;

    b.  Agreements, memoranda of understanding, or similar records pertaining to the ability of other public or private entities to use or access data collected through or derived from mail digitization systems;

    c.  Records concerning requests from federal, state, or local government entities for access to data collected through or derived from mail digitization systems, including any responses to those requests;

    d.  Records regarding the frequency with which the Bureau of Prisons has conducted searches of data collected through or derived from mail digitization systems;

    e.  Records reflecting the volume of data or the number of scanned letters retained in mail digitization systems.

3.  All communications concerning the evaluation, expansion, extension, or termination of the MailGuard pilot program or other mail digitization efforts.

4.  All records explaining or discussing the Bureau's rationale for launching the MailGuard pilot program.

5. All records concerning the collection or retention of data about the senders of mail through mail digitization systems.

6. The following records relating to the incidence of contraband introduction through the use of mail in jails and prisons:

   a. Any statistical data concerning the incidence and results of searches for contraband before and after the adoption of a mail digitization system;

   b. Any statistical data concerning the incidence and results of drug testing before and after the adoption of a mail digitization system;

   c. Any statistical data concerning the introduction of contraband into correctional facilities via mail;

   d. Any statistical data comparing the primary sources of contraband present in correctional facilities; and

   e. Records analyzing such data, or other quantitative or qualitative analysis of contraband introduction through the use of mail in jails and prisons.

7. All presentations, publications, training materials, pamphlets, press releases, or other documents explaining or providing guidance on mail digitization systems to Bureau of Prisons employees, incarcerated individuals, or members of the public.

8. All complaints or inquiries submitted regarding mail digitization systems, including but not limited to complaints about the copying of privileged or confidential mail, undelivered or late mail, rejected mail, poor photocopies, and the retention of mail sent to incarcerated individuals, and any responses to those complaints or inquiries.

9. All records relating to the use of tablets, kiosks, or other electronic means to access digitized mail by incarcerated individuals.

10. All policies or procedures relating to the reading, retention, and copying of mail sent to incarcerated individuals, including both incoming mail and mail already in the possession of those individuals.

We ask that you include all cover letters and attachments to these documents. We also ask that you disclose all segregable portions of otherwise exempt records. *See* 5 U.S.C. § 552(b). We ask that you provide responsive electronic records in their native file format. *See* 5 U.S.C. § 552(a)(3)(B). If that is not possible, please provide the records electronically in a text-searchable, static-image format (e.g., PDF), in the best image quality in the agency's possession, and in separate, Bates-stamped files.

Finally, we ask that you process our request on a rolling basis, giving priority to the first three items of the request.

## III. Application for expedited processing

The Knight Institute requests expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E). There is a "compelling need" for the documents sought because the information they contain is "urgent[ly]" needed by an organization primarily engaged in disseminating information "to inform the public about actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II).

> A. *The Knight Institute is primarily engaged in disseminating information in order to inform the public about actual or alleged government activity.*

The Knight Institute is "primarily engaged in disseminating information" within the meaning of FOIA. 5 U.S.C. § 552(a)(6)(E)(v)(II).

The Knight First Amendment Institute was established at Columbia University to defend and strengthen the freedoms of speech and the press in the digital age. Research and public education are essential to the Institute's mission.[29] Obtaining information about government activity, analyzing that information, and publishing and disseminating it to the press and public are among the core activities the Institute performs. *See ACLU v.*

---

[29] Mike McPhate, *Columbia University to Open a First Amendment Institute*, N.Y. Times (May 17, 2016), https://perma.cc/YC9M-LUAD; James Rosen, *New Institute Aspires to Protect First Amendment in Digital Era*, McClatchy DC (May 20, 2016), https://perma.cc/ZS2K-FPED.

*DOJ*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004) (finding non-profit public interest group that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience" to be "primarily engaged in disseminating information") (quoting *Elec. Privacy Info. Ctr. v. DOD*, 241 F. Supp. 2d 5, 11 (D.D.C. 2003)).[30]

For example, the Institute disseminates information about government activity—including information about government activity obtained under FOIA—through a variety of means, including its website,[31] Twitter account,[32] press releases,[33] blog posts,[34] op-eds,[35] and regular engagement with the press.[36] The

[30] *See About the Knight Institute*, Knight First Amendment Inst., https://perma.cc/8UYT-RUUZ (explaining that a priority of the Knight Institute's work is "ensuring access to information necessary for self-government").

[31] *See* Knight First Amendment Inst., https://knightcolumbia.org (last visited June 24, 2021).

[32] *See* Knight First Amendment Inst. (@knightcolumbia), Twitter, https://perma.cc/4KXK-7MC4 (Knight Institute account with over 13,000 followers).

[33] *Knight Institute Calls on DOJ's Executive Office for Immigration Review to Suspend Policy Silencing Immigration Judges*, (Jan. 6, 2020), https://perma.cc/GT69-A8SC (describing an agency policy obtained through FOIA).

[34] *See, e.g.*, Anna Diakun, *Redactions in CDC Communications Policies Leave Key Questions Unanswered*, Knight First Amendment Inst. (June 12, 2020), https://perma.cc/GQX3-WKCN; Stephanie Krent, *Recently Released OLC Opinions from 1974 Shed Light on Current Legal Debates*, Knight First Amendment Inst. (May 18, 2020), https://perma.cc/34N2-UAQ3.

[35] *See, e.g.*, Anna Diakun & Trevor Timm, *For the Biden Administration, Who Counts as News Media?*, Colum. Journalism Rev. (June 9, 2021), https://perma.cc/PR7T-75FQ; Jameel Jaffer & Ramya Krishnan, *We May Never See John Bolton's Book*, N.Y. Times (Jan. 30, 2020), https://perma.cc/HGY9-638T.

[36] *See* Cora Currier, *Government Can Spy on Journalists in the U.S. Using Invasive Foreign Intelligence Process*, Intercept (Sept. 17, 2018, 11:43 AM), https://perma.cc/YQ7F-NZ5R (reporting on DOJ rules obtained by the Knight Institute under FOIA); Jessica Jerreat, *CDC Media Guidance Blacklists VOA Interview Requests*, VOA News (June 14, 2020, 7:59 PM), https://perma.cc/2KVX-WGYR (reporting on CDC email obtained by the Knight Institute under FOIA); Ellen Nakashima, *U.S. Spy Agencies Sued for Records on Whether They Warned Khashoggi of Impending Threat of Harm*, Wash. Post (Nov. 20, 2018, 8:57 PM), https://perma.cc/C6CW-TSDA (describing FOIA lawsuits); Charlie Savage, *U.S. Government Went Through These People's Phones at the Border. Read Their Stories.*, N.Y. Times (Dec. 22, 2017), https://perma.cc/H7P2-RK2T (describing and publishing several hundred

Institute also publishes records obtained through FOIA in "Reading Rooms" on the Institute's website, which allows the public to search, filter, and view the records.[37]

Through its research program, the Institute has published multiple influential essay series, including one focused on reimagining the First Amendment in the digital age, one addressing the technology giants' power to shape public discourse, and another on the relationship between big data and self-government.[38] In addition, the Institute has convened three research symposia—drawing practitioners, lawyers, academics, and journalists—to debate, discuss, and reflect on key issues in First Amendment doctrine and free speech theory. The first, "A First Amendment for All? Free Expression in an Age of Inequality," was held in March 2018;[39] the second, "The Tech Giants, Monopoly Power, and Public Discourse," was held in November 2019;[40] and the third, "Data and Democracy," was held in October 2020.[41]

### B. The records sought are urgently needed to inform the public about actual or alleged government activity.

The documents sought are urgently needed to inform the public about actual or alleged government activity. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II). Specifically, the requested records will shed light on an ongoing federal program that may be subjecting Americans to increased surveillance and chilling correspondence between incarcerated individuals and their communities. Initial reports of the MailGuard program described it as a one-year pilot

---

complaints obtained by the Knight Institute about warrantless searches of electronic devices at the border).

[37] *See, e.g.*, *The OLC's Opinions*, Knight First Amendment Inst., https://knightcolumbia.org/reading-room/olc-opinions (last visited June 24, 2021).

[38] *See Research*, Knight First Amendment Inst., https://perma.cc/TVD9-39RK.

[39] *A First Amendment for All? Free Expression in an Age of Inequality*, Knight First Amendment Inst. (Mar. 23, 2018, 8:30 AM); https://perma.cc/DM59-74KG.

[40] *Leading Legal Scholars, Economists, and Technologists to Headline Fall Symposium*, Knight First Amendment Inst. (Jan. 8, 2020), https://perma.cc./86DE-TPQS.

[41] *Data and Democracy*, Knight First Amendment Inst., https://knightcolumbia.org/events/data-and-democracy (last visited June 24, 2021).

program,[42] but more than a year later, individuals who wish to send mail to those incarcerated at the two sites involved in the pilot program are still directed to send their mail to Smart Communications.[43] Officials with the Bureau of Prisons have recently confirmed that they are considering the expansion of the Mail-Guard pilot program.[44] The public has thus far been denied an accounting of this ongoing program, which makes drastic changes to the mail policies and procedures in federal correctional facilities at a time when correspondence is one of the only means incarcerated individuals have to connect with loved ones. These records are urgently needed so that the members of the public can understand and consider the scope of the program before the Bureau makes its final decision about whether to extend, expand, or terminate the MailGuard program.

For these reasons, the Knight Institute is entitled to expedited processing.

## IV.  Application for waiver or limitation of fees

The Knight Institute requests a waiver of document search, review, and duplication fees on the grounds that disclosure of the requested records is in the public interest and that disclosure is "likely to contribute significantly to the public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

For the reasons explained above, disclosure of the record would be in the public interest. Moreover, disclosure would not further the Knight Institute's commercial interest. The Institute will make any information disclosed available to the public at no cost. Thus, a fee waiver would fulfill Congress's legislative intent in amending FOIA to ensure "that it be liberally construed in favor of waivers for noncommercial requesters." *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) (quoting

---

[42] *E.g.*, Brown & Dayden, *supra* n.6.

[43] *FCI Beckley*, Fed. Bureau of Prisons, https://perma.cc/5ZJ9-D7BN (instructing senders of general correspondence to mail letters to Smart Communications under heading "How to Send Things Here"); *USP Canaan*, Fed. Bureau of Prisons, https://perma.cc/RN55-9NQA (same).

[44] *See* Brown & Dayden, *supra* n.6; Demopoulos, *supra* n.10.

*McClellan Ecological Seepage Situation v. Calucci*, 835 F.2d 1282, 1284 (9th Cir. 1987)).

The Knight Institute also requests a waiver of search and review fees on the grounds that it qualifies as an "educational . . . institution" whose purposes include "scholarly . . . research" and the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II). The Institute has a substantial educational mission. Situated within a prominent academic research university, the Institute performs scholarly research on the application of the First Amendment in the digital era. The Institute's research program brings together academics and practitioners of different disciplines to study contemporary First Amendment issues and offer informed, non-partisan commentary and solutions. It publishes that commentary in many forms, including in scholarly publications and in short-form essays.

The Knight Institute also requests a waiver of search and review fees on the grounds that it is a "representative[] of the news media" within the meaning of FOIA and the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II).

The Institute meets the statutory definition of a "representative of the news media" because it is an "entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii); *see also Nat'l Sec. Archive v. DOD*, 880 F.2d 1381, 1387 (D.C. Cir. 1989) (finding that an organization that gathers information, exercises editorial discretion in selecting and organizing documents, "devises indices and finding aids," and "distributes the resulting work to the public" is a "representative of the news media" for purposes of the FOIA); *accord Serv. Women's Action Network v. DOD*, 888 F. Supp. 2d 282 (D. Conn. 2012); *ACLU of Wash. v. DOJ*, No. C09-0642RSL, 2011 WL 887731, at *10 (W.D. Wash. Mar. 10, 2011); *ACLU*, 321 F. Supp. 2d at 30 n.5. Courts have found other non-profit organizations, whose mission of research and public education is similar to that of the Knight Institute, to be "representatives of the news media." *See, e.g., Cause of Action v. FTC*, 799 F.3d 1108 (D.C. Cir. 2015); *Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d at 10–15 (finding a non-profit group that disseminated an electronic newsletter and published books was a "representative of the news media" for purposes of FOIA); *Nat'l Sec. Archive*, 880 F.2d at 1387; *Judicial Watch, Inc. v. DOJ*, 133 F.

Supp. 2d 52, 53–54 (D.D.C. 2000) (finding Judicial Watch, self-described as a "public interest law firm," a news media requester).

For these reasons, the Knight Institute is entitled to a fee waiver.

<p style="text-align:center">*     *     *</p>

Thank you for your attention to our request. We would be happy to discuss its terms with you over the phone or via email to clarify any aspect of it.

<div style="margin-left:40%">

/s/ Stephanie Krent
Stephanie Krent
Xiangnong Wang
Alex Abdo
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
stephanie.krent@knightcolumbia.org

</div>